IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 08-00667 JMS |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT'S |
| | ) | MOTION TO SUPPRESS |
| vs. | ) | |
| | ) | |
| DAVID E. KUBA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

On February 24, 2009, Defendant David E. Kuba ("Kuba") filed a

Motion to Suppress Evidence ("Defendant's Motion") seeking an order

suppressing all evidence obtained in connection with a May 25, 2007 search

warrant and statements made to law enforcement agents during the execution of

the search warrant.

After reviewing Defendant's Motion, the supporting and opposing

memoranda, and the arguments of counsel, the court DENIES Defendant's

Motion.

## I.  BACKGROUND

Immigration and Customs Enforcement ("ICE") Special Agent Marc Mato ("Agent Mato") prepared an affidavit and application for a warrant to search Kuba's residence for specific evidence relating to the possession of child pornography.  Magistrate Judge Leslie E. Kobayashi issued the warrant on May 25, 2007, and ICE agents conducted the search of Kuba's residence on May 29, 2007.  ICE agents seized two laptop computers, a CD-R media disk, and a bank statement -- all containing evidence that Kuba possessed child pornography.

On February 23, 2009, Kuba filed a motion seeking to suppress the evidence obtained by the search warrant and statements he made to ICE agents during the search.[1]  The government filed an Opposition on March 9, 2009.  A hearing was held on March 16, 2009.

### A.    The Investigation

On or about October 2005, ICE agents initiated Operation Emissary, a nationwide federal investigation into the sale and distribution of child pornography on a commercial website that labeled itself "illegal.CP." ("Illegal CP").  Pl.'s Ex. A, Mato Aff. ¶¶ 27-29.  Illegal CP offered 20- or 30-day

---

[1]  At the hearing, Defendant conceded that he was read his *Miranda* rights and that his statements were voluntary and therefore withdrew his motion to suppress his statements.

2

subscriptions to its website containing thousands of child pornography images and videos. *Id.*

As of October 2005, Illegal CP's banner page -- the page that initially appeared on the Internet without entering any financial or personal information -- included more than one dozen images of what appeared to be minors engaging in sexual acts with other minors or adults, proclaimed that "[n]ow you are in [sic] few minutes away from the best children porn site on the net!", and included a "Join Now" icon. *Id.* ¶ 29.

On or about October 26, 2005, an undercover ICE agent clicked the "Join Now" icon and purchased access to Illegal CP. *Id.* ¶ 30. The next day the undercover agent received an email from Theodore_dykstra@hotmail.com (the "dykstra account") providing the undercover agent with a login, password, and Illegal CP's URL address in order to access the website. *Id.* The email also stated that credit card charges would appear on the undercover agent's credit card in the amount of $79.99 for "ADSOFT." *Id.* Upon entering the login and password at the URL address provided, the undercover agent gained access to Illegal CP, which contained thousands of images of child pornography featuring mostly prepubescent females. *Id.* ¶¶ 31-32.

To further the investigation, ICE agents: (1) intercepted emails to and from the dykstra account pursuant to an order authorizing the interception of electronic communications and (2) executed a search warrant on JetPay, a third party processing company that verified financial data for some of the purchases of Illegal CP subscriptions.[2]  *Id.* ¶¶ 35-37, 45-49.  The government intercepted emails to and from the dykstra account from on or about December 27, 2005 to January 25, 2006 and January 27, 2006 to February 25, 2006.  *Id.* ¶¶ 35-36.  The government executed the search warrant on JetPay on or about September 19, 2006 and obtained subscriber data from JetPay's computer for ADSOFT purchases from February 1, 2006 through mid-July 2006.  *Id.* ¶ 47.

By intercepting the emails to and from the dykstra account, ICE agents learned that once an individual clicked "Join now" on Illegal CP's banner page and entered his financial information, that information was transmitted to the dykstra account.  The dykstra account then transmitted the applicant's information to another email address for verification, and after verification the dykstra account would send an email to the applicant notifying him that his application was

---

[2]  As explained in the Mato Affidavit, as a third party processor, JetPay "receives the datastream input by individual customers seeking to purchase goods or services from an Internet merchant, and verifies . . . all of the necessary data to complete a transaction . . . before forwarding the relevant data to the appropriate credit card company."  Mato Aff. ¶ 45.

approved and provide him with access to Illegal CP.  *Id.* ¶ 35.  The email that the dykstra account received identifying the approved applicants' email addresses also contained the word "term" followed by four or five digits -- e.g., "term12345" -- for each approved email address.  *Id.*

The September 19, 2006 search of the JetPay database for all purchases billed to ADSOFT revealed the subscribers' names, addresses, credit card numbers, dates and times of purchase, the amount of $79.99 for each purchase, and the word "term" followed by a five digit number for each purchase. *Id.* ¶ 47.  From February 1, 2006 to February 25, 2006 ("February 2006 overlap period") the government had information from the dykstra account and the Jetpay database, which revealed that *every one* of the more than 200 individuals in the JetPay database whose credit card was authorized to make an ADSOFT purchase during this period also received an email from the dykstra account granting him access to Illegal CP.  *Id.* ¶¶ 48-49.[3]

Based upon the information gathered in the February 2006 overlap period, the use of "term" followed by four or five digits in both the JetPay

---

[3]  Additionally, ICE agents investigated the ADSOFT website by making attempts on March 16, March 23, and April 9 of 2006 to purchase "RegFreeze" spyware for $79.99 -- the same amount as a 20-day subscription to Illegal CP -- but each attempt brought agents to a web page that could not be displayed.  Mato Aff. ¶ 46 n.13.

5

database and the dykstra account, and the apparent dysfunctionality of the

ADSOFT website, ICE agents determined that a purchase billed to ADSOFT in

the JetPay database was solely for access to Illegal CP, *id.* ¶¶ 35, 47-49, and the

ADSOFT website merely served to create the appearance that ADSOFT was a

legitimate company.  *Id.* ¶ 46 n.13.

**B.      Evidence that Kuba Subscribed to Illegal CP**

On or about October or November 2006, ICE agents reviewed the

data recovered from the search warrant on the Jetpay database and found that a

David Kuba at 47-519 Hui Iwa Street, Kaneohe, Hawaii 96744 made an ADSOFT

purchase for $79.99 on June 4, 2006.  *Id.* ¶ 51.  The JetPay database for Kuba's

purchase also contained the phrase "term37407."  *Id.*  Due to information obtained

in the Operation Emissary investigation, ICE agents determined that this purchase

was for access to Illegal CP.  *See id.* ¶¶ 48-51.

On or about March 21, 2007, ICE agents received Kuba's subpoenaed

credit card billing records that revealed his Mastercard was billed $79.99 by

ADSOFT on June 4, 2006 and that the payment was made without dispute.  *Id.*

¶ 52.  During April and May 2007, ICE agents confirmed that Kuba lived at the

Kaneohe, Hawaii address listed in the JetPay database by checking public

databases, doing surveillance, and obtaining his Internet service provider records. *Id.* ¶¶ 53-57.

**C.      The Warrant, the Search, and the Seizure**

Based upon the general information that ICE agents obtained during the Operation Emissary investigation, specific evidence of Kuba's purchase of the child pornography subscription, and confirmation of Kuba's residence, Agent Mato prepared an affidavit ("Mato Affidavit") and application for a warrant to search Kuba's residence and to seize evidence of child pornography on his computer, related electronic media, and in other related records and files. *Id.* Attach. A.

The Mato Affidavit provided Magistrate Judge Kobayashi with information on computers and the Internet with regard to child pornography trafficking and possession, characteristics of pedophiles and collectors of child pornography, details of Operation Emissary, and an explanation of the evidence that established that Kuba subscribed to the child pornography website. Accordingly, Magistrate Judge Kobayashi issued the search warrant on May 25, 2007.

On May 29, 2007, nine ICE agents searched Kuba's residence and seized two laptop computers, a CD-R media disk, and a bank statement.  A

7

forensic examination of Kuba's two computers revealed approximately 1,100 files appearing to contain child pornography and approximately 375 images that appeared to be child erotica.  The CD-R disk contained an additional 91 apparent child pornography files and approximately 401 files containing what appeared to be adult pornography.  The majority of the images appeared to depict prepubescent females.

## II.  ANALYSIS

Kuba contends that the May 25, 2007 warrant lacked probable cause to support its determination that he possessed or received child pornography at the time the warrant was issued.  Specifically, Kuba argues that the Mato Affidavit failed to establish probable cause that he had purchased a child pornography subscription from Illegal CP.  Alternatively, Kuba maintains that even if probable cause existed as of June 4, 2006 when he allegedly purchased the child pornography subscription, probable cause dissipated by the time the warrant was issued on May 25, 2007.  As a result, Kuba requests that the evidence obtained from the May 25, 2007 search warrant be suppressed.  The United States counters that the Mato Affidavit provided sufficient information to establish probable cause that Kuba purchased a subscription to Illegal CP and that the probable cause was not stale because the Mato Affidavit identified the hoarding characteristics of

purchasers of child pornography.  For the foregoing reasons, the court DENIES

Kuba's Motion.

## A.    Probable Cause Existed to Issue the May 25, 2007 Search Warrant

For a search warrant to issue, the Fourth Amendment requires that

there be "probable cause, supported by Oath or affirmation."  U.S. Const. Amend.

IV.  "[P]robable cause means a fair probability that contraband or evidence is

located in a particular place.  Whether there is a fair probability depends upon the

totality of the circumstances, including reasonable inferences, and is a

commonsense, practical question.  Neither certainty nor a preponderance of the

evidence is required."  *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir.

2007) (citation and quotation signals omitted); *see also Illiniois v. Gates*, 462 U.S.

213, 238 (1983); *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en

banc) ("[P]robable cause means 'fair probability,' not certainty or even a

preponderance of the evidence." (citation signal omitted)).  Doubtful cases should

be resolved in favor of a warrant.  *Kelley*, 482 F.3d at 1050-51.

Where a defendant challenges a magistrate judge's probable cause

determination, this court's role "'is simply to ensure that the magistrate had a

substantial basis for concluding that probable cause existed.'"  *See United States v.*

*Battershell*, 457 F.3d 1048, 1050 (9th Cir. 2006) (quoting *Gates*, 462 U.S. at 238-

9

39); *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007); *see also United States v. Brobst*, --- F.3d ---, 2009 WL 579585, at *6 (9th Cir. March 9, 2009) ("We [ ] review a magistrate's finding of probable cause to issue a search warrant for clear error[.]"); *Gourde*, 440 F.3d at 1069 ("We are not in a position to flyspec the affidavit [in support of the search warrant] through de novo review.").  "Great deference" is given to the magistrate judge's finding of probable cause to issue a search warrant.  *See Brobst*, --- F.3d ---, 2009 WL 579585, at *6.

      **1.**    ***There Was Probable Cause to Believe That Kuba Purchased Access to Illegal CP on June 4, 2006***

        Illegal CP is a self proclaimed child pornography website that provides 20-day subscription access to thousands of illicit images of prepubescent females for $79.99.  Mato Aff. ¶¶ 29, 31-32.  On May 25, 2007, Magistrate Judge Kobayashi was presented with the Mato Affidavit that indicated the following: (1) all 200 plus sales identified on the JetPay database to ADSOFT in the amount of $79.99 from February 1, 2006 to February 25, 2006 were for subscriptions to Illegal CP, *see id.* ¶¶ 47-49; (2) the word "term" followed by four or five digits was found in the dykstra account (the account that forwarded subscribers access to Illegal CP) and the word "term" followed by five digits was found on the JetPay database for ADSOFT purchases, *id.* ¶¶ 35, 47; (3) the JetPay database indicated

that a David Kuba in Kaneohe, Hawaii made a $79.99 purchase from ADSOFT on June 4, 2006, with a reference to "term37407," *id.* ¶ 51; and (4) Kuba's Mastercard bill contained a $79.99 charge to ADSOFT on June 4, 2006 and the bill was paid without dispute. *Id.* ¶ 52.  Considering the Mato Affidavit as a whole, it raises a fair probability that Kuba purchased access to Illegal CP on June 4, 2006, and subsequently downloaded images to his computer.

Specifically, given that the Mato Affidavit explained that each and every one of the more than 200 individuals listed on the JetPay database whose credit card purchase to ADSOFT was authorized between February 1, 2006 and February 25, 2006 also received an email from the dykstra account granting them access to Illegal CP, there is certainly at least a fair probability that Kuba's undisputed $79.99 ADSOFT purchase on June 4, 2006 -- less than four months later -- was also for a subscription to Illegal CP.  Further, the fact that Kuba's ADSOFT purchase identified in the JetPay database included the words "term37407" -- similar to "term" followed by four or five digits in the dykstra account *and* "term" followed by five digits in the 200 plus February 2006 ADSOFT purchases directly linked to Illegal CP -- also supports the determination

that Kuba's purchase was for Illegal CP.[4]  Thus, Magistrate Judge Kobayashi had

a substantial basis for concluding that there was probable cause that Kuba

purchased a subscription to Illegal CP, and subsequently downloaded images of

child pornography onto his computer.

              Kuba's argument that the Affidavit failed to "conclusively" establish

that his ADSOFT charge was for a subscription to Illegal CP is without merit.  *See*

Def.'s Mot. 24.  Probable cause is not found only on "conclusive" proof of illegal

activity -- instead the proper question to determine whether there was probable

cause to issue a warrant is a question of "fair probability," which depends upon the

totality of the circumstances and reasonable inferences.  *See Kelley*, 482 F.3d at

1050; *Gourde*, 440 F.3d at 1073-74 (rejecting defendant's argument that "a search

warrant for child pornography may issue only if the government provides concrete

evidence, without relying on any inferences, that a suspect *actually* receives or

possesses images of child pornography" and applying the "fair probability

standard").  Reasonable inferences to support a determination of probable cause to

issue a search warrant may be based upon direct or circumstantial evidence.  *See*

---

     [4]  Additionally, the Mato Affidavit stated that ICE agents were unable to purchase any
legitimate merchandise on the ADSOFT website, providing further support for the reasonable
determination that Kuba's purchase was for Illegal CP and not for legitimate merchandise.  *See*
Mato Aff. ¶ 46 n.13.

*United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007).[5] As explained above,

considering the totality of the circumstances and reasonable inferences therefrom,

the Mato Affidavit provided Magistrate Judge Kobayashi with a substantial basis

for concluding that there was a fair probability that Kuba's June 6, 2006 ADSOFT

purchase was for a child pornography subscription.[6]

### 2.   There Was Probable Cause to Believe That Kuba Possessed Evidence of Child Pornography at His Home in May 2007

Probable cause to believe that Kuba had evidence of possession of

child pornography at his home existed at the time the warrant was issued on May

25, 2007 -- eleven months after he allegedly subscribed to Illegal CP.

"An affidavit must be based on facts so closely related to the time of

the issue of the warrant as to justify a finding of probable cause at that time."

*United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997) (citation and quotation

---

[5] At the hearing, Kuba's counsel argued that probable cause did not exist to issue the search warrant, in part, because too many inferences were required -- thereby suggesting that a showing of probable cause requires direct rather than circumstantial evidence. To the contrary, "a probable cause determination can be supported entirely by circumstantial evidence." *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007); *see also United States v. Spearman*, 532 F.2d 132 (9th Cir. 1976) (per curiam) (finding that circumstantial evidence justified inferring probable cause for search warrant).

[6] Kuba's claim that ADSOFT may have sold other products does not defeat the government's showing of probable cause. Even assuming that ADSOFT sold computer equipment or adult pornography subscriptions for $79.99, the Mato Affidavit as a whole still provided a fair probability that Kuba's June 4, 2006 purchase from ADSOFT for $79.99 was for a subscription to Illegal CP, a child pornography website.

signals omitted).  Whether probable cause is stale due to the passing of time between the information that justified the probable cause and the time of the issuance of the warrant is evaluated "in light of the particular facts of the case and the nature of the criminal activity and property sought."  *Id.*  "[T]he mere lapse of substantial amounts of time is not controlling in a question of staleness."  *Id.*

Because people who possess child pornography often keep those materials in their home for long periods of time, probable cause based upon information obtained months or even years prior is not necessarily stale in the child pornography context.  *See Lacy*, 119 F.3d 745-46 (finding probable cause based on 10-month old information not stale in child pornography case); *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (holding that three- year gap between gathering evidence and issuance of warrant did not render probable cause stale because evidence was presented that "customers of child pornography sites do not quicky dispose of their cache"); *United States v. Eberle*, 266 Fed. Appx. 200, 206 (3d Cir. 2008) (same for three and half years); *United States v. Irving*, 452 F.3d 110, 116, 124-25 (2d Cir. 2006) (same for two years).  For example, *Lacy* validated a search warrant based on ten-month old information because "the nature of the crime [of child pornography], as set forth in [the] affidavit, provided 'good reason[ ]' to believe the computerized visual depictions

downloaded by Lacy would be present in his apartment when the search was conducted ten months later."  *Lacy*, 119 F.3d at 746;[7] *see also United States v. Thayer*, 2008 WL 5102529, at *5 (N.D. Cal. Dec. 2, 2008) (finding probable cause based on year old information not stale because nature of crime of child pornography and FBI's ability to recover deleted computer files was "good reason" to believe child pornography would still be present at Thayer's home).

Like in *Lacy*, the information in Mato's Affidavit established that probable cause existed *at the time the warrant issued* because it established good reason to believe that child pornography would still be in Kuba's home eleven months after he subscribed to Illegal CP.  Specifically, Mato's Affidavit established a fair probability that Kuba purchased a subscription to a child pornography website on June 4, 2006, *see* Mato Aff. ¶¶ 35, 47-49, 51-52, and that, in his experience as an ICE agent, individuals that collect child pornography rarely, if ever, dispose of their sexually explicit materials, *id.* ¶¶ 26-27,[8]

---

[7]  In *Lacy*, based on her training and experience, the affiant explained that collectors and distributors of child pornography value their sexually explicit materials and "rarely, if ever" dispose of such materials and often store those materials for long periods in their homes. *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997).  Similarly, the Mato Affidavit states that "[i]ndividuals involved in the collection of child pornography rarely, if ever dispose of their sexually explicit material" and that "such materials are instead treated as prized possessions, which can be viewed or traded over a long period of time."  Mato Aff. ¶ 26(d) (emphasis and capitalization removed).

[8]  The Mato Affidavit states that persons who purchase subscriptions to member only

(continued...)

individuals who subscribe to child pornography websites typically download the images from the Internet and store them on their computers, *id.* ¶¶ 26, 58, computers permit storage of a large quantity of child pornography images, *id.* ¶¶ 16-20, and forensic experts can retrieve images that have been downloaded, viewed, and deleted for months or years after deletion.  *Id.* ¶ 20; *see also Gourde*, 440 F.3d at 1071 ("It neither strains logic nor defies common sense to conclude, based on the totality of these circumstances, that someone who paid for access for two months to a website that actually purveyed child pornography probably had viewed or downloaded such images onto his computer.").  The Mato Affidavit also established that Kuba still resided at the Kanehoe, Hawaii address listed in the JetPay database.  Mato Aff. ¶¶ 53-57.  Considering this information, there is *no basis* to find that probable cause dissipated in the eleven months between the time Kuba purchased the subscription to Illegal CP and the time the warrant was issued. Put differently, the Mato Affidavit clearly established a fair probability that Kuba purchased an online subscription to Illegal CP and, as a result, a fair probability that he would still have evidence relating to the possession of child pornography in his home eleven months later.

_____

[8](...continued)
websites offering child pornography "typically maintain their images indefinitely so as to have ready and immediate access to them."  Mato Aff. ¶ 58.

Thus, the May 25, 2007 search warrant was valid.

**B.     Even If There Was Not Probable Cause, ICE Agents Reasonably Relied Upon the Warrant in Good Faith**

Even if the Mato Affidavit fell short of establishing probable cause, the court would find that the search warrant was sought and executed in good faith, rendering suppression unavailable as a remedy.

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court adopted what is often referred to as the "good faith" exception to the exclusionary rule.  The good faith exception applies, and suppression is unwarranted, unless

> (i) . . . an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement; (ii) . . . the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official; (iii) . . . the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or (iv) . . . the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

*United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (citing *Leon*, 468 U.S. at 923-26); *see also United States v. Huggins*, 299 F.3d 1039, 1044 (9th Cir. 2002).

17

Mato's Affidavit, if deficient, falls squarely within the good faith exception.  Reliance on the warrant, given the facts set forth in the affidavit, was clearly objectively reasonable.  Further, there is absolutely no evidence that Agent Mato acted in bad faith by either intentionally or recklessly misleading Magistrate Judge Kobayashi.  To the contrary, Agent Mato consulted with a government attorney prior to requesting the warrant and was advised that the affidavit was sufficient -- a strong indicator of good faith.  *See United States v. Brown*, 951 F.2d 999, 1005 (9th Cir. 1991) ("[A]n officer's consultation with a government attorney is of significant importance to a finding of good faith.").  There is also no evidentiary basis to find that Magistrate Judge Kobayashi completely abandoned her judicial role as a neutral official.  Finally, the warrant was not facially deficient either in the place to be searched or the things to be seized.

The court, therefore, finds that, even if the Mato Affidavit failed to set forth sufficient facts to establish probable cause, Agent Mato acted in good faith and the evidence obtained on May 29, 2007 need not be suppressed.

For the reasons stated above, Kuba's Motion as to the evidence obtained pursuant to the search warrant is DENIED.

///

///

18

### III.  <u>CONCLUSION</u>

For the reasons stated herein, the court DENIES Kuba's Motion to Suppress.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 20, 2009.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. Kuba*, Cr. No. 08-00667 JMS, Order Denying Defendant's Motion to Suppress